**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
AKIRO, LLC,                                    :     <u>Case No.</u>: 12-CV-5775
                                               :
                            Plaintiff,         :
                                               :     The Hon. Jed S. Rakoff (U.S.D.J.)
            – against –                        :
                                               :
HOUSE OF CHEATHAM, INC.,                       :     <u>ECF Case</u>
*and* ROBERT H. BELL,                          :
                                               :
                            Defendants.        :     <u>Dated</u>: February 26, 2013
-------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
<u>**SUMMARY JUDGMENT AGAINST DEFENDANT, HOUSE OF CHEATHAM, INC.**</u>


**C**ARTER **P**EK, P.C.

<u>By</u>:   **D. Reeves Carter, Esq.**
        **Matthew A. Pek, Esq.**
110 Wall Street, 11th Floor
New York, New York 10005
<u>Tel.</u>:   (212) 709-8095
<u>Fax</u>:   (212) 943-2300

*Counsel for Plaintiff,*
*Akiro, LLC*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 4

ARGUMENT ......................................................................................................... 8

I.   **Documentary Evidence Confirms Defendant's Liability for Trademark Infringement** ..... 8

    A.   Plaintiff's MISS JESSIE'S Mark is Valid ...................................................... 9

    B.   Application of the *Polaroid* Factors Confirms Likelihood of Confusion .......................... 9

        1.   *The Actual Confusion Factor Favors Plaintiff* ............................... 11

        2.   *The Strength of the Mark Factor Favors Plaintiff* ................................... 14

        3.   *The Similarity of the Marks Factor Favors Plaintiff* ................................ 15

        4.   *The Proximity of the Parties' Goods Factor Favors Plaintiff* ................. 17

        5.   *The Bridging the Gap Factor Favors Plaintiff* .................................. 17

        6.   *The Quality of Defendant's Goods Factor Favors Plaintiff* .................... 18

        7.   *The Sophistication of the Consumer Factor Favors Plaintiff* .................... 19

        8.   *The Bad Faith Factor Favors Plaintiff* ................................. 19

    C.   Doubts Concerning the Likelihood of Confusion Are Resolved in Plaintiff's Favor ...... 21

    D.   Plaintiff Has Demonstrated its Federal Claim for False Designation of Origin .............. 21

    E.   Plaintiff Has Established its State Law Claim for Unfair Competition .......................... 22

CONCLUSION ..................................................................................................... 23

`

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page #**

*1-888 Contacts, Inc. v. WhenU.Com, Inc.,*
    414 F.3d 400 (2d Cir. 2005).................................................................................. 8

*Armstrong Cork Co. v. Armstrong Plastic Covers Co.,*
    434 F. Supp. 860 (E.D. Mo. 1977)........................................................................ 11

*BigStar Entm't, Inc. v. Next Big Star, Inc.,*
    105 F. Supp. 2d 185 (S.D.N.Y. 2000).................................................................. 14

*Brennan's Inc. v. Brennan's Rest., LLC,*
    360 F.3d 125 (2d Cir. 2004)................................................................................. 14

*Cadbury Beverages, Inc. v. Cott Corp.,*
    73 F.3d 474 (2d Cir. 1996),..................................................................................... 8

*De Venustas v. Venustas Intern., LLC.,*
    07 CIV. 4530 LTS/THK, 2007 WL 2597122 (S.D.N.Y. Sept. 11, 2007) ............................ 11, 18

*Fourth Toro Family Ltd. Partnership v. PV Bakery, Inc.,*
    88 F.Supp.2d 188 (S.D.N.Y. 2000)................................................................ 10-11

*Gucci America, Inc. v. Accents,*
    No. 96 CIV. 9575, 1997 WL 691431 (S.D.N.Y. Nov. 5, 1997) (**Rakoff, J.**)............................ 10

*Henegan Const. Co., Inc. v. Heneghan Contracting Corp.,*
    No. 00 CIV. 9077 (JGK), 2002 WL 1300252 (S.D.N.Y. June 12, 2002)........................ 14, 17, 21

*Hershey Foods Corp. v. Voortman Cookies Ltd.,*
    367 F.Supp.2d 596 (S.D.N.Y. 2005) (**Rakoff, J.**) ........................................................ 8

*Jones v. Ground Zero Ent.,*
    No. 0-Civ.-6461, 2006 WL 1788949 (S.D.N.Y. June 28, 2006) (**Rakoff, J.**)............................ 8

*Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc.,*
    192 F.3d 337 (2d Cir. 1999)........................................................................... 13, 18

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
    799 F.2d 867 (2d Cir. 1986)................................................................................. 14

*Morningside Group Ltd. v. Morningside Capital Group, LLC,*
    182 F.3d 133 (2d Cir. 1999).................................................................................... 8

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.,*
    269 F.3d 114 (2d Cir. 2001)........................................................................... 12, 13

*Phillips-Van Heusen Corp. v. Calvin Clothing Co., Inc.*,
444 F.Supp.2d 250 (S.D.N.Y. 2006) (**Rakoff, J.**) ...................................................... 11

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) 8, 10, 11, 12

*Polo Fashions, Inc. v. Extra Spec. Prod., Inc.*,
451 F.Supp. 555 (S.D.N.Y. 1978).......................................................................... 11

*Rodgers v. Wright*,
544 F. Supp. 2d 302 (S.D.N.Y. 2008)...................................................................... 14

*Spear, Leads, & Kellogg v. Rosado*,
122 F.Supp.2d 403 (S.D.N.Y. 2000) (**Rakoff, J.**) ............................................... 8-10

*Sports Authority, Inc. v. Prime Hospitality Corp.*,
89 F.3d 955 (2d Cir. 1966)............................................................................... 9, 14

*Streetwise Maps, Inc. v. Vandam, Inc.*,
159 F.3d 739 (2d Cir. 1998)............................................................................ 10, 14

*Toy Manufacturers of America v. Helmsley-Spear, Inc.*,
960 F.Supp. 673 (S.D.N.Y. 1997)................................................................ 13, 17, 19

*Yurman Design, Inc. v. PAJ, Inc.*,
262 F.3d 101 (2d Cir. 2001)................................................................................. 9

*W.W.W. Pharm. Co. v. Gillette Co.*,
984 F.2d 567 (2d Cir. 1993)............................................................................... 10

## **Rules and Statutes**                                               **Page #**

15 U.S.C. § 1114 .......................................................................................... *passim*

15 U.S.C. § 1125(a) ...................................................................................... *passim*

Fed. R. Civ. P. 56 ............................................................................................. 1

## PRELIMINARY STATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff, Akiro, LLC ("Plaintiff"), by and through its undersigned counsel, respectfully submits this memorandum of law in support of Plaintiff's motion for summary judgment against defendant House of Cheatham, Inc. ("Defendant") on the following claims:  **(a)** federal trademark infringement pursuant to Section 32(1)(A) of the Lanham Act (15 U.S.C. § 1114); **(b)** federal unfair competition and false designation of origin pursuant to Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); and **(c)** New York State common law unfair competition, all arising from Defendant's willful and unauthorized use of Plaintiff's famous trademark, MISS JESSIE'S, as used in connection with Plaintiff's hair care products specifically formulated for curly or natural hair ("MISS JESSIE'S Mark" or "Plaintiff's Mark").

Here, there is a smoking gun that points directly at Defendant's deliberate intent to infringe on and benefit from the goodwill and reputation associated with Plaintiff's well known and registered trademark – MISS JESSIE'S Mark.  In fact, prior to launching its AUNT JACKIE'S hair care products, Defendant's own trademark counsel warned Defendant "to stay away from <u>anything the Miss Jennie's [sic] is using</u>."  *See* Affidavit of Titi Branch, sworn to on February 26, 2013 (the "Branch Aff."), at ¶ 16, **<u>Exhibit K</u>** (DEF. 59) (emphasis added).  Defendant, however, failed or refused to follow the advice of its own counsel.

Defendant's own correspondence reveals that Defendant sought to trade off on the entire look and feel of Plaintiff's MISS JESSIE'S Mark.  For example, Defendant wrote to its trademark counsel and confirmed that, "<u>[a] few of the brands in the natural hair category have trade dress that conveys a premium, old fashioned look and feel.  That is the direction we have chosen too</u>."  *Id.* (emphasis added).  Before going to market, Defendant's own documents further confirm that Defendant was fully aware of Plaintiff's MISS JESSIE'S Mark and hair care products and that the

reference to "brands in the natural hair category" was a direct and express reference to the MISS JESSIE'S Mark because Defendant presented and prepared side by side review of its trade dress and trademark as compared against the MISS JESSIE'S Mark and related products.  *Id.*, at ¶ 15, **Exhibit I** (DEF. 57-58; 62-63).   It is important to note, Defendant originally selected the mark "Miss Jackie's" in the same cursive font as Plaintiff's MISS JESSIE'S Mark, however, upon review of the side by side comparison of Defendant's proposed trade dress and trademark, even Defendant's own counsel warned that "you really need to stay away from anything that Miss Jennie's [sic] is using." *Id.*, at ¶ 16, **Exhibit K**, (DEF. 59) (emphasis added).  Well before Defendant produced and marketed its first AUNT JACKIE'S product, Defendant's counsel expressly addressed the risks of moving forward with its proposed trademark and foreshadowed this litigation:

> We may need to discuss this a bit.  When I ran the search names, I did not know that you had specific competitors [sic] products in mind.  The searches can't really be done in a vacuum [sic].  At the very least, the script of MISS JACKIE'S absolutely needs to change. . . . .  I think there is a risk that Miss Jennie's [sic] will complain about the trade dress overall and MISS JACKIE'S mark specifically.  I think you would have good arguments in defense of such a claim.  But, the having to defend the claim could be the problem.  Taken individually, the elements are not confusingly similar.  When taken as a whole (Miss Jennie's [sic] would argue) they get a bit closer.

*Id.* (emphasis added).

Making matters worse, Defendant is also imitating Plaintiff's label design and at least one of Defendant's hair care products is the same distinctive – and yet completely arbitrary – lavender color of one of Plaintiff's most well recognized and best selling hair care products, namely MISS JESSIE'S CURLY PUDDING.

Defendant, however, did not "stay away," but rather ignored its own counsel's warning, and instead Defendant only replaced "Miss" with "Aunt" and changed the font.  *Id.*, at ¶ 16, **Exhibit K** (DEF. 59 and 83).  Defendant's decision to ignore counsel's advice is even more alarming because its trademark counsel expressly informed Defendant that "of the two [proposed marks], Miss

Leslie's was clearer than Miss Jackie's/Jacqui's." *Id.* at ¶ 16, **Exhibit K** (DEF. 16).  In any event, as a result of Defendant's failure or refusal to follow its counsel's advice, the parties are now engaged in the precise litigation that Defendant's counsel had predicted.  Likewise, Defendant was fully aware of the risks associated with moving forward, and even asked its counsel, "after filing how long will it take before we know whether there is an objection by the trademark office or owners [of Jackie-formative marks]?" *Id. at* ¶ 16, **Exhibit K** (DEF. 33).

Even Defendant acknowledges that Plaintiff is a direct competitor that sells similar product to the same or similar consumer, namely women with natural or curly hair, and consumers are currently encountering AUNT JACKIE'S and MISS JESSIE'S hair care products in the same channels of trade and often in the same stores, on the same shelves. *Id.* at ¶¶ 15 and 17, **Exhibit J, Exhibit L** (DEF. 93 and 100-102).  Thus, confusion was inevitable.  Indeed, it is no mere coincidence that there are already instances of actual consumer confusion as well as initial consumer confusion, even though Defendant's AUNTIE JACKIE'S products have been in the marketplace for less than one year.  This is the exact confusion that Defendant sought to create (but could have easily avoided) and it is the precise confusion that Plaintiff seeks to stop in its tracks before Defendant expands its distribution channels and creates even more confusion.

For these reasons and other reasons set forth in greater detail below, Plaintiff was left with no other option than to commence this action, and presently seeks to enjoin Defendant from continuing to use its AUNT JACKIE'S Mark in connection with Defendant's business of selling hair care products based on Defendant's liability for: **(a)** federal trademark infringement pursuant to Section 32(1)(A) of the Lanham Act (15 U.S.C. § 1114); **(b)** unfair competition and false designation of origin pursuant to Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); and **(c)** unfair competition under New York State common law.  Finally, Plaintiff respectfully requests that, should this Court deem it just, warranted and proper to award Plaintiff any and all appropriate

monetary damages available under the circumstances of this action, including but not limited to trebled and/or punitive damages, as well as any and all reasonable attorneys' fees, Court filing fees, or any other litigation-related expenses that Plaintiff has been forced to incur in connection with Plaintiff's costly yet unavoidable prosecution of this action.

## STATEMENT OF FACTS

*Plaintiff is a Leader in the Hair Care Market*

Plaintiff is the recognized leader in the natural and curly hair care product market, and the MISS JESSIE's products are setting new sales trends to address the changes in hairstyles. *Id.*, ¶ 3, **Exhibit A**, at p. 8.  There is a growing natural hair trend among Black women in the U.S. *Id.*, at p. 7.  Natural hair is generally defined as hair that is not chemically altered. *Id.*  The shift from relaxed to natural is becoming so common that it has spurred the growth of a whole new subsegment of products for women who are "transitioning," with products that minimize breakage as hair transitions from chemically straightened to curly or kinky. *Id.*  Indeed, independent research confirms that the percentage of Black women saying they relax their at home declined by 7% from 2010 to 2011. *Id.*, at p. 7.  In fact, 36% of Black women surveyed say they do not use hair relaxers, up significantly from the 26% from the previous year. *Id.* Thus, it is no surprise that companies, like Defendant, that market hair care products that relax natural hair are on the decline and remain in search of ways to gain access and entry into the natural and curly hair care market. *Id.*, at p. 37.

In less than a decade, Plaintiff's MISS JESSIE'S products reversed the sales trend by being among the first brands to offer hair care products for natural and curly hair. *Id.*, at p. 23.  Thus, the MISS JESSIE'S Mark is recognized as a leader in the category and is credited for revitalizing the entire black hair care market, which was in a steep decline. *Id.*, at p. 8.  Plaintiff's MISS JESSIE'S products are further distinguished because "[a]lthough Miss Jessie's products are merchandised in the Black haircare section in select Target stores, the brand has widened its appeal to curly-haired

consumers of all backgrounds through both its product selection and its marketing." *Id.*, at p. 27. Indeed, after "Target began distributing niche natural <u>favorites</u> Miss Jessie's, SheaMoisture, The Jane Carter Solution, and CURLS.  Miss Jessie's saw its sales at FDMx jump from 288% from 2010-11 (to $3.2 million). . . ." *Id.*, at p. 23 (emphasis added).

### *A Brief History of Plaintiff's MISS JESSIE'S Mark*

Since at least as early as 2003, Plaintiff has used its MISS JESSIE'S Mark continuously and without interruption in connection with the sale of its hair care products.  *Id.*, at    ¶ 7.  Over the course of the past ten (10) years, Plaintiff has expended and applied considerable financial investment (and other valuable resources) toward the marketing, advertising, and promoting of its MISS JESSIE'S Mark, which monetary investments alone amount to a total sum in excess of one million dollars ($1,000,000.00), including marketing and promotional campaigns such as "sampling events," "gifting suites" and "giveaways."  *Id.*, at ¶ 7, **Exhibit C**.  During such time, Plaintiff has also participated in numerous hair care product trade shows throughout the United States, and has purchased advertising placements in highly popular, nationally recognized magazine publications, including but not limited to: *Lucky*, *Elle*, *Allure*, *O Magazine*, *Marie Claire*, *US Weekly*, *Vibe*, *Essence*, *Ebony*, *Juicy, Sister to Sister, Cosmo Girl, Star, Ladies' Home Journal*, *Mira!*, and *Latina*. *Id.*, at ¶ 8, **Exhibit D**.

In addition, Plaintiff has advertised and promoted the MISS JESSIE'S Mark on numerous billboards strategically placed to target wide audiences, through audio spots on popular radio broadcasts, and has expended thousands more dollars in connection with the hiring and retention of individual publicists as well as public relations firms, in order to promote the MISS JESSIE'S Mark.  *Id.*, at ¶ 9.  As a result of Plaintiff's continuing, uninterrupted, cost-intensive and far-reaching efforts to market, advertise, and promote its MISS JESSIE'S Mark and related products, Plaintiff has earned millions of dollars.  *Id.*  Plaintiff's MISS JESSIE'S Mark has achieved national

fame and recognition, garnered a loyal and ever-increasing following and fan base.  *Id.*  Recently, MISS JESSIE'S was the official United States hair care product partner of *Sparkle* – the theatrical movie release staring Jordin Sparks and Whitney Houston.  *Id.*

The MISS JESSIE'S Mark has been recognized by popular magazines and specialty publications as the best hair care product for "kinky, curly and wavy hair." *Id.*, at ¶ 10, **Exhibit D**. Moreover, as recently as August 2011, the MISS JESSIE'S CURLY PUDDING hair care product was featured on NBC's *Today Show* as a "best of brand" product.  *Id.*  Plaintiff and the MISS JESSIE'S Mark enjoys a huge and ever-increasing following and fan base, including influential journalists, magazine publications, online bloggers who devote hours of their time to compiling and producing videos and Internet broadcasts, praising and applauding the MISS JESSIE'S hair care products. *Id.*, ¶ 11, **Exhibit A**, at p. 47.

Plaintiff's prior rights to and interests in the MISS JESSIE'S Mark (including variations, derivatives and colorable imitations thereof) are beyond debate.  Plaintiff is the certified owner of the MISS JESSIE'S Mark in connection with hair care products, which was awarded registration by the United States Patent and Trademark Office ("USPTO"), Registration No. 3,482,013 (the "Registration").  *Id.*, at ¶ 12, **Exhibit B**.  The Registration is valid, subsisting, has remained in full force and effect, and serves as compelling evidence of the validity and ownership of Plaintiff's MISS JESSIE'S Mark, thereby evincing Plaintiff's exclusive rights to the use of its MISS JESSIE'S Mark, under which Plaintiff sells a variety of hair care products, including without limitation: PILLOW SOFT CURLS; CURLY MERINGUE; CURLY PUDDING; CRÈME DE LA CRÈME; RAPID RECOVERY TREATMENT; SUPER SWEETBACK TREATMENT; STRETCH SILKENING CRÈME; QUICK CURLS; SUPER SLIP SUDSY SHAMPOO, CRÈME DE LA CURL; BABY BUTTERCREME; and CURLY BUTTERCREME – all under its famous MISS JESSIE'S Mark. *Id.*, at ¶ 13, **Exhibit F**.

*Defendants' Bad Acts*

Plaintiff recently learned that Defendant is now using the AUNT JACKIE'S Mark in connection with its business of selling its own line of inferior hair care products, which, as with Plaintiff's famous products, are specifically formulated for natural and curly hair.  *Id.*, at ¶ 14, **Exhibit G**.  Defendant began using its AUNT JACKIE'S Mark in 2012 – long after Plaintiff had conclusively established its lawful and exclusive ownership of, interests in and rights to Plaintiff's Mark. *Id.*

A cursory comparison of the two (2) marks at issue here readily confirms that Defendant's AUNT JACKIE'S Mark is confusingly similar to Plaintiff's MISS JESSIE'S Mark.  Defendant's AUNT JACKIE'S Mark and Plaintiff's MISS JESSIE'S Mark are used in connection with the same or similar products, namely, hair care products for natural and curly hair.  *Id.*, at ¶ 15, **Exhibit I** (DEF. 57-58 and 62-63).  Further, Defendant's hair care products and Plaintiff's hair care products are marketed to the same consumers and Defendant considers Plaintiff to be a direct competitor. *Id.*, at ¶ 15, **Exhibit J** (DEF. 93, 100-02).  Defendant's use of the AUNT JACKIE'S Mark was first undertaken and continues today, willfully and deliberately, with full knowledge of Plaintiff's prior use, rightful ownership of and exclusive rights to and interests in the MISS JESSIE'S Mark, and with the specific, willful and calculated intention of creating confusion among consumers, and to deceive consumers of the same or virtually identical markets into wrongly believing that Plaintiff sponsors, approves of, or has otherwise authorized Defendant's use of the AUNT JACKIE'S Mark in connection with the sale of Defendant's competing product line, thereby causing immeasurable and irreparable harm to Plaintiff. *Id.*, at ¶¶ 16-17, **Exhibits K – L**.

Against this factual background and in light of controlling legal authority, Plaintiff is entitled to full protection of its MISS JESSIE'S Mark.

## ARGUMENT

Guided by controlling case law, and based upon the irrefutable documentary evidence, Plaintiff readily establishes the entitlement to recover on its claims against Defendant for: **(a)** federal trademark infringement pursuant to Section 32(1)(A) of the Lanham Act (15 U.S.C. § 1114); **(b)** federal unfair competition and false designation pursuant to Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); and **(c)** common law unfair competition under New York State common law.

## I.    Documentary Evidence Confirms Defendant's Liability for Trademark Infringement

As this Court has observed and reaffirmed on countless occasions, it is well-settled that in order to prevail on a claim for trademark infringement under the Lanham Act, a plaintiff must show that it "has a valid mark entitled to protection and that defendant's use of it is likely to cause confusion." *Spear, Leads, & Kellogg v. Rosado*, 122 F.Supp.2d 403, 405 (S.D.N.Y. 2000) (**Rakoff, J.**) (*citing Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 137 (2d Cir. 1999)) (*quoting Cadbury Bevs., Inc. v. Cott Corp*, 73 F.3d 474, 477 (2d Cir. 1996)); *see also 1-888 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 407 (2d Cir. 2005).

Further, as this Court has consistently held, "[i]n assessing whether there is a likelihood of confusion between [any] two [given] marks, a court must undertake the familiar analysis set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).  *Hershey Foods Corp. v. Voortman Cookies Ltd.*, 367 F.Supp.2d 596, 599 (S.D.N.Y. 2005) (**Rakoff, J.**).

Simply put, "[i]f consumers believe that the trademark owner sponsors or endorses the use of the challenged mark, the confusion requirement is satisfied." *Jones v. Ground Zero Ent.*, No. 0-Civ.-6461, 2006 WL 1788949, *1 (S.D.N.Y. June 28, 2006) (**Rakoff, J.**) (*citing Polaroid*, 287 F.2d 492, 495 (2d Cir. 1961)).

A.  Plaintiff's MISS JESSIE'S Mark is Valid

Here, the United States Patent and Trademark Office principle register confirms that MISS JESSIE'S is a registered and valid mark (USPTO Registration No. 3,482,013) covering "cosmetics, and hair care products, namely, hair creams and hair milks, hair care products, namely shampoos, conditioners, and hair moisturizing creams," and further confirms that Plaintiff's MISS JESSIE'S Mark has been in use at least as early as 2003, and registered on August 5, 2008. *See* Branch Aff., at ¶ 7, **Exhibit B**. Thus, "because it [trademark] has been registered with the [USPTO] it is presumed valid and protectable." *Spear,* 122 F.Supp.2d at 405 (**Rakoff, J.**) (*citing Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir. 1966)); *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 114 (2d Cir. 2001) ("[a] certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark. . . .") (citation omitted); *Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc.,* 192 F.3d 337, 345 (2d Cir. 1999) ("[r]egistration by the [US]PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive. As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of mark's protectability. . . .") (emphasis added).

Accordingly, because the MISS JESSIE'S Mark is registered, it is presumed to be entitled to the greatest degree of protection under the Lanham Act.  *See id.*

B.  Application of the *Polaroid* Factors Confirms Likelihood of Confusion

Having established that Plaintiff's MISS JESSIE'S Mark is valid and protectable under the Lanham Act, "the central [remaining] question is whether the defendant's entrance into the marketplace and its use of its mark will generate a likelihood of confusion among an appreciable number of ordinarily prudent purchasers." *Id.* (citations omitted).  As this Court has routinely reaffirmed and reiterated in numerous prior rulings:

> To measure the likelihood of confusion, the Court weighs the so-called 'Polaroid' factors: (1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that plaintiff will 'bridge the gap' and offer a product like defendant's; (5) actual confusion between products; (6) defendant's good [or bad] faith; (7) the quality of defendant's product as compared to plaintiff's; and (8) the sophistication of the purchasers.

*Spear*, 122 F.Supp.2d at 405 (**Rakoff, J.**) (granting plaintiff permanent injunction based on likelihood of success on "its claims of trademark infringement and of false designation of origin under section 43(a) of the Lanham Act) (*citing Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)); *see Gucci America, Inc. v. Accents,* No. 96 CIV. 9575, 1997 WL 691431, *2-3 (S.D.N.Y. Nov. 5, 1997) (**Rakoff, J.**).  As this Court is also keenly aware, "[t]he foregoing list of factors does not exhaust the possibilities – [as] the court may still have to take other variables into account."  *Id.* (*citing W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993)); *Fourth Toro Fam. Ltd. P'ship v. PV Bakery, Inc.*, 88 F.Supp.2d 188, 195 (S.D.N.Y. 2000) ("[i]nstances of actual confusion are positive proofs that confusion is likely").

More to the point, based on this Court's own prior decisions and rulings in numerous cases involving trademark infringement and the Lanham Act overall, where, as here, a plaintiff has, in fact, presented *prima facie* evidence confirming the validity of its mark that, as a matter of law, the *Polaroid* factors may well be applied to grant a movant's application for summary judgment under Federal Rule 56 and award a plaintiff injunctive and/or monetary relief, where, as here, a plaintiff has established a *prima facie* claim for infringement under the Lanham Act.  *See, e.g., Gucci*, 1997 WL 691431 at *2 ("[s]ummary judgment is appropriate if the undisputed evidence would lead to only one conclusion under the *Polaroid* test") (**Rakoff, J.**) (citation omitted).  As in *Gucci*, so too here, this Court should likewise grant Plaintiff's motion for summary judgment, due to the strikingly similar facts of this case to those at issue in *Gucci*:

> Because the validity of the Chanel and Gucci marks in issue in this lawsuit is well-established and not disputed, and because none of the defendants have raised a genuine issue of material fact . . .  the Court concludes that plaintiffs are likewise entitled to summary judgment as to defendants' liability on the Section 43(a) claim as on the Section 32(1) claim.  *Id.* at *3.

Here, the *Polaroid* factors establish a likelihood of confusion between the marks at issue here, lending further strength to Plaintiff's Lanham Act and unfair competition claims.  *See, e.g.*, *Phillips-Van Heusen Corp. v. Calvin Clothing Co., Inc.*, 444 F.Supp.2d 250, 256 (S.D.N.Y. 2006) (**Rakoff, J.**) ("the touchstone of these claims is a likelihood of consumer confusion as to product … origin").  Accordingly, based on this Court's prior instructive rulings, Plaintiff respectfully submits that a proper application of the *Polaroid* factors here should summarily establish Plaintiff's right to summary judgment.

1.    *The Actual Confusion Factor Favors Plaintiff*

Given that "[i]nstances of actual confusion are positive proofs that confusion is likely," it is only appropriate to begin the *Polaroid* analysis by reviewing this factor.  *Fourth Toro Family Ltd. P'ship*, 88 F. Supp. 2d, at 195.  To be certain, "actual confusion is not necessary to establish a likelihood of confusion but can often provide highly probative evidence of this likelihood." *Henegan Const. Co., Inc.*, 2002 WL 1300252, at * 10.  As such, "[t]he Second Circuit has deemed evidence of actual confusion 'particularly relevant' to the inquiry" of the likelihood of confusion." *De Venustas v. Venustas Intern., LLC.*, 07 CIV. 4530 LTS/THK, 2007 WL 2597122 (S.D.N.Y. Sept. 11, 2007) (*quoting Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998)).  Therefore, it is not surprising that, "the presence of actual confusion is perhaps the strongest evidence of the likelihood of confusion."  *Polo Fashions, Inc. v. Extra Spec. Prod., Inc*., 451 F.Supp. 555, 561 (S.D.N.Y. 1978); *accord Armstrong Cork Co. v. Armstrong Plastic Covers Co.*, 434 F. Supp. 860, 871 (E.D. Mo. 1977) ("since actual confusion is difficult to uncover in trademark cases, any evidence of actual confusion is strong evidence of likelihood of confusion").

It is well settled that examples of "anecdotal confusion [are] admissible to establish actual consumer confusion." *Nora Beverages, Inc. v. Perrier Group of Am., Inc*., 269 F.3d 114, 123-24 (2d Cir. 2001).  Here, Plaintiff presents evidence of well-documented instances of actual confusion and initial consumer confusion among the relevant purchasing public of consumers, even though Defendant's AUNT JACKIE'S products have only been in the market for less than one (1) year.  Thanks to the soaring popularity and sheer prevalence of the Internet that hosts and facilitates bloggers and vloggers alike, Plaintiff can point to specific examples of confusion.  For example, a blogger who set out to do a product review of MISS JESSIE'S products instead mistakenly purchased an AUNT JACKIE'S product by accident:

> Originally I had gone there to try out Sof'n'Free's new Nothing But curl pudding . . . but as the product wasn't there I started scanning the shelves for an alternative as I hated to leave there empty handed.  <u>When I first saw this product I was actually convinced that it was a Miss Jessie's product. (Anyone familiar with this line will know why when you see it.)  It wasn't until I got home that I realized it was something completely different.  I am confident that there are some copyright issues going on there</u> . . . anyway I digress ….. Branch  Aff., at ¶ 17, **Exhibit L** (emphasis added).

Even Defendant is aware of instances of initial consumer confusion, and during the course of discovery Defendant produced documents demonstrating such confusion:

> I saw aunt jackie's products in my local beauty supply store (in durham, nc).  <u>They had right beside the miss jessie's and if you weren't paying attention, you'd mistake the two.  The labels look JUST alike lol!</u>  My sister said since she can't afford jessie's, jackie's will do! Lol. *Id.*, at (DEF. 100) (emphasis added).

> No worries, I thought the same things.  Plus I hate the name, I am tired of companies trying to relate to 'us' with names like Aunt Jackie, Miss Jessie's, As I Am, Kinky Kurly, etc.  What happened to brands like KeraCare, Mizani, Design Essentials, LustraSilk etc. *Id.*

> FYI:  <u>There is a debate going on fb [Facebook] that some beauty bloggers don't want to try your products cause it resembles miss jessie's</u> ... smh … . *Id* .(emphasis added).

> I love aunt jackies it was one of the first products I purchased when going natural and especially after I looked at the price of miss jessie's and I decided to go with this product I love it and the smell is heavenly! *Id.*

> No shade to the products but why can't these new companies come out with more original packaging.  This is the 2nd or 3rd new hair care line I have seen and the

packaging resembles another  line . . . .  *Id.*

Because it is all about marketing and buyer impulse.  They are giving the illusion of another established product in the marketplace and thus capitalizing on the established reputation of that product.  Maybe if the buyer doesn't notice, he/she will buy??  In my legal opinion it looks like trademark infringement and they are opening themselves up to a lawsuit.  *Id.*, at (DEF. 101).

I stumbled across this product by Aunt Jackie's [] called 'Curl La La' which claims to define curls.  For only $7.99 I decided to try it.  <u>I assume Aunt Jackie's [] is a cheaper brand to Miss Jessie's</u> (emphasis added).  *Id.*

Just purchased Aunt Jackie's almost like Miss Jessie's please let me know if you have tried it???  *Id.*, at (DEF. 102).

Such occurrences are critical because it is well settled that, "a court may find infringement has occurred based on confusion that creates initial customer interest, even if no final sale is completed as a result."  *Toy Manufacturers of America v. Helmsley-Spear, Inc.*, 960 F.Supp. 673, 679 (S.D.N.Y. 1997) (citations omitted).

It is no surprise that there are already documented instances of actual confusion and initial confusion between MISS JESSIE'S and AUNT JACKIE's hair care products, because, as borne out in detail below, Defendants intentionally set out to create such confusion.  Thus, Plaintiff plainly requires this Court's protection because while Defendant's infringing products have been in the marketplace for less than one (1) year, there are already instances of actual confusion and initial confusion.  Indeed, the U.S. Second Circuit Court of Appeals has keenly observed that "[i]t would be unfair to penalize [a plaintiff] for acting to protect its trademark before [more] serious damage has occurred."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986) ("the record indicates that sales of appellants' jeans have been minimal in the United States thus far and there has been little chance for actual confusion as yet").  Here, Plaintiff merely seeks to minimize the risk of further confusion between the parties' marks, before Plaintiff suffers any further harm.  Accordingly, there can be little doubt that this important factor tips in Plaintiff's favor.

2.      *The Strength of the Mark Factor Favors Plaintiff*

The strength of the mark is a measure of "'its tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source.'" *Henegan Const. Co., Inc.*, 2002 WL 1300252 (*quoting The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960-61 (2d Cir. 1996)).   To determine a mark's strength, courts consider two factors: (1) its inherent distinctiveness; and (2) its distinctiveness in the marketplace.  *See Streetwise Maps, Inc. v. VanDam, Inc*., 159 F.3d at 743.

"[I]nherent distinctiveness examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so."  *Brennan's Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 131 (2d Cir. 2004).  Significantly, the federal registration of Plaintiff's MISS JESSIE'S Mark confirms its inherent distinctiveness.  *See Lane Capital Mgm't, Inc.*, 192 F.3d at 345 ("[r]egistration by the [US]PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive") (citations omitted).

In contrast, distinctiveness in the marketplace "looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods and services."  360 F.3d at 131.  Here, Plaintiff and its MISS JESSIE'S Mark is recognized as an industry leader that invented and currently dominates the natural and curly hair care products category. As the independent consumer research organization, Mintel Group Ltd., reported:

> The success stories in the FDMx [Food, Drug, and Mass Merchandisers] Black haircare market are the companies found in the 'other' group.  These are brands that are newer to the market and lack the history of the larger brands, but are making an impact with consumers.  Brands like SheaMoisture and Miss Jessie's, which have a strong following through online and salon sales but have only broken into the FDMx market in the last two years, have grown availability through select Target stores. . . . Haircare blogs and video logs (vlogs) on YouTube have helped to spread word-of-mouth about these brands and <u>rejuvenated a category that many FDMx retailers (and consumers) might have seen as dying out</u>.

Branch Aff., ¶ 3, **Exhibit A**, at p. 8 (emphasis added).

In addition, Plaintiff and its MISS JESSIE'S products have received wide spread and diverse media coverage where Plaintiff's MISS JESSIE'S products are recognized as the best products within the natural and curly hair care product category. *Id*. Lastly, the fact that Defendant chose to copy the look, feel, and overall general "old fashioned" commercial impression of Plaintiff's MISS JESSIE'S Mark cannot be ignored. Here, there can be no doubt that Defendant certainly recognized the strength of Plaintiff's MISS JESSIE'S Mark. Defendant had no natural and curly hair care products, but instead was producing chemical relaxer products with declining sales. *Id.*, ¶ 3, **Exhibit A** at p. 37. In effort to increase its profits, Defendant created a new hair care products for natural and curly hair and deliberately chose to copy one of the most popular and best selling natural and curly brands on the market – MISS JESSIE'S. As such, Plaintiff's distinct position in the marketplace cannot be debated or challenged. Accordingly, the strength of mark factors tips in Plaintiff's favor.

3.    *The Similarity of the Marks Factor Favors Plaintiff*

When comparing the trademarks to determine the likelihood of confusion, "the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone." *Direct Marketing of Va., Inc. v. E. Mishan & Sons, Inc.*, 753 F.Supp. 100, 106 (S.D.N.Y. 1990). In addition, "[t]he examination of the similarity of the trademarks, however, does not end with a visual comparison of the marks. <u>Trademarks, like small children, are not only seen but heard. Similarity of sound also enters into the calculation of likelihood of confusion.</u>" *Grotian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir. 1975) (citations omitted) (emphasis added). For example, in *Grotian*, after completing a side by side visual comparison of the competing the marks, the court agreed that, "Grotian-Steinway mark is in Old English type while that of Steinway is in Roman type. This

difference serves to distinguish the marks visually." *Id.*   Yet, the court affirmed "[t]he district court's finding that auditory confusion is inevitable and thus that similarity of marks exits … ." *Id.*

Any analysis of this similarity factor requires an understanding that Defendant intended to create a mark that would be confused with Plaintiff's MISS JESSIE'S Mark.  Defendant's own correspondence reveals that Defendant sought to trade off on the entire look and feel of Plaintiff's MISS JESSIE'S Mark.  For example, Defendant wrote to its trademark counsel and confirmed that, "a few of the brands in the natural hair category have trade dress that conveys a premium, old fashioned look and feel.  That is the direction we have chosen too."  Branch Aff., ¶ 16, **Exhibit K**, (DEF. 59).  Making matters worse, Defendant is also imitating Plaintiff's label design and at least one of Defendant's hair care products is the same distinctive – and yet completely arbitrary – lavender color of Plaintiff's most well recognized and best selling hair care products, namely MISS JESSIE'S CURLY PUDDING.  Further, Defendant originally selected the mark "Miss Jackie's" in the same cursive font as Plaintiff's MISS JESSIE'S Mark, but its counsel warned that, "you really need to stay away from anything that Miss Jennie's [sic] is using." *Id.*  Defendant, however, did not "stay away" and instead Defendant simply replaced "Miss" with "Aunt" and changed the font. *Id.*, ¶ 16, **Exhibit K** at (DEF. 83 and 95).  Such changes are insufficient and merely confirm that Defendant sought to come as close as possible to Plaintiff's MISS JESSIE'S Mark, despite warnings from Defendant's counsel.

In fact, it is difficult indeed to imagine another any other mark that more closely resembles Plaintiff's MISS JESSIE'S Mark than AUNT JACKIE'S.   "Miss" and "Aunt" are easily interchangeable and still convey a similar general commercial impression – which was Defendant's "me-too" approach in selecting its mark.  In addition, the competing marks share a similar dominant root word – "JESSIE'S" and "JACKIE'S."   Both "JESSIE'S" and "JACKIE'S" share a hard "J" sound at the beginning of the names and both end with the same hard "EZ" sound.  Of course,

Defendant's trademark counsel advised Defendant to "stay away" from the MISS JESSIE'S Mark and further informed Defendant that as between two of Defendant's proposed marks, "Miss Leslie's was clearer than Miss Jackie's/Jacqui's." *Id.*, ¶ 16, **Exhibit K**, at (DEF.16 and 59).

In short, whatever the visual differences between the respective marks may be and subtle difference between "Jessie's" and "Jackie's," such differences have failed to prevent actual confusion, which is already occurring in the market. *See, e.g., SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 1043 (Fed. Cir. 1983) ("[t]he scope of protection of a mark is bounded by the line at which there is a likelihood of confusion of the public caused by another's use of the same or similar mark, not by technicalities"). Thus, here too the similarity of marks factor tips in Plaintiff's favor.

### 4. *The Proximity of the Parties' Goods Factor Favors Plaintiff*

This next *Polaroid* factor is the proximity of the parties' goods, "which depends upon both (i) whether and to what extent the two services compete with each other and (ii) the nature of services themselves and the structure of the relevant market." *Hennegan, Inc.*, 2002 WL 1300252, at * 6 (citations omitted). There can be no dispute that the parties' products are similar and that consumers encounter the competing products in the same channels of trade and often on the very same shelves in the same beauty supply stores. Branch Aff., ¶ 17, **Exhibit L**, at (DEF. 100-02). Equally important, Defendant has expressly identified Plaintiff as a direct competitor. *Id.*, at ¶ 15, **Exhibit J**, at (DEF. 93). As such, Defendant cannot now be heard to argue there is no proximity. *See Toy Mfrs.*, 960 F.Supp., at 681. ("I need not expend too much energy discussing these issues, as [defendant] believes plaintiff and defendants are now in direct competition") (finding proximity factor favored plaintiff's case). Accordingly, the proximity factor tips in Plaintiff's favor.

### 5. *The Bridging the Gap Factor Favors Plaintiff*

"The [next] factor looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, 'bridge the gap'." *Id.* at * 10 (*citing Centaur*

*Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987)).  As demonstrated above, because there is no gap to bridge between the parties' hair care products offered by each party under their respective marks, this factor, too, tips in Plaintiff's favor.

      6.    *The Quality of Defendant's Goods Factor Favors Plaintiff*

The sixth *Polaroid* factor "measures the quality of the parties' services." *Hennegan*, 2002 WL 1300252, at * 6 (*quoting Arrow Fastener Co., Inc.*, 59 F.3d at 398).  To that end, "[c]ourts look to whether the infringing [product] is of lower quality, thereby 'tarnishing [the] plaintiff's reputation if consumers confuse the two.'  If the [products] are of equal quality, this may 'create confusion as to source because of that very similarity in quality.'"  *De Venustas*, 2007 WL 2597122, at 4; *Morningside Group Ltd. v. Morningside Cap. Group, LLC*, 182 F.3d 133 (2d Cir. 1999).

Plaintiff's increasingly popular and nationally renowned line of MISS JESSIE'S products are widely recognized as superior, specialized hair care products, many of which, including MISS JESSIE'S CURLY PUDDING, MISS JESSIE'S BABY BUTTERCREME, and MISS JESSIE'S QUICK CURLS, are award-winners.  Branch Aff., at ¶ 10, **Exhibit D**.  In contrast, Defendant does not – because it cannot – make any such claims as to its own (inferior) line of products.  In fact, a cursory review of the documentary evidence submitted here reveals a critical, glaring and above all, telling *absence* of any such high praise or prestigious industry accolades, particularly when compared against the impressive host of awards, honors and distinctions that Plaintiff's MISS JESSIE'S products have earned in recent years, such that Plaintiff has steadily risen to its well-earned, well-deserved status as one of few industry leaders in the relevant market at issue.

In any event, even if Defendant could demonstrate that its AUNT JACKIE'S products were as good as or better than those sold by MISS JESSIE'S (which is not so), controlling Second Circuit precedent confirms that, "the good quality of [Defendant's] [hair care products] actually may increase the likelihood of confusion as to source." *Lois*, 799 F.2d at 875 (emphasis added).  Thus,

any such closeness in the quality of goods would nonetheless raise the risk of confusion that the Lanham Act was designed to prevent.  Therefore, this factor, too, tips in Plaintiff's favor.

   7.    *Sophistication of the Consumer Factor Favors Plaintiff*

The seventh *Polaroid* factor recognizes that, "[t]he greater the value of an article the more careful the typical consumer can be expected to be:  the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine. The degree of reliance by consumers on labels and trademarks will also vary from product to product." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979).  However, where the products are identical and the marks are identical, the sophistication of bury cannot be relied on to prevent confusion.  For example, in *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971), the court held that even though the ordinary purchaser would be expected to make "more than a casual inspection" before buying an expensive camera, such inspection would be of doubtful value because the cameras from each of two different sources were both labeled "Exakta."  Here, the competing products are relatively inexpensive hair care products; and therefore, it cannot be argued that the average consumer will devote considerable attention between the competing products with similar marks that are sold through similar channels of trade.  Thus, this factor also tips in Plaintiff's favor.

   8.    *The Bad Faith Factor Favors Plaintiff*

The proper inquiry for the bad faith factor is whether Defendant created and selected its AUNT JACKIE'S Mark "with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991).  Here, Defendant, the indisputable second comer here, has a duty to name and dress its products so as to avoid likelihood of confusion with Plaintiff, the indisputable senior user, and Plaintiff's MISS JESSIE'S Mark. *See, e.g., Toy Mfrs.,* 960 F.Supp., at 682 *(citing*

*Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980 (1982), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).  Defendant breached its duty, and "evidence of intentional copying raises the presumption that the second comer intended to create a confusing similarity." *Id.* (*citing Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586-87 (2d Cir. 1993)).

As shown above, there is strong evidence that Defendant intended to copy the look, feel, and general commercial impression of MISS JESSIE'S Mark and products and informed its counsel that, "a few of the brands in the natural hair category have trade dress that conveys a premium, old fashioned look and feel.  That is the direction we have chosen too."  Branch Aff., at ¶ 16, **Exhibit K**, at (DEF. 59).  Further still, Defendant selected the AUNT JACKIE'S Mark in an attempt to come as close as possible to Plaintiff's MISS JESSIE'S Mark in order to benefit from the goodwill and reputation of Plaintiff's MISS JESSIE'S Mark – even though Defendant's counsel warned Defendant, "you really need to stay away from anything that Miss Jennie's [sic] is using," and further advised that "[o]f the two [proposed marks], Miss Leslie's clearer than Miss Jackie's/Jacqui's." *Id.*, ¶ 16, **Exhibit K**, at (DEF. 16 and 59).  Defendant's decision to ignore counsel's prudent advice underscores Defendant's bad faith. *See, e.g., Pfizer Inc. v. Sachs*, 08 CIV. 8065 (WHP), 2009 WL 2876255, at * 3 (S.D.N.Y. Sept. 8, 2009) ("Defendants do not claim ignorance of the Viagra Marks … [n]or did Defendants seek or rely on the advice of counsel.  Accordingly, this factor weighs in favor of finding a likelihood of confusion").

In addition, Defendant created a styling gel and selected the same highly distinctive, fanciful and arbitrary lavender color as MISS JESSIE'S CURLY PUDDING, which is one of Plaintiff's best-known and most critically-acclaimed products.  Branch Aff., at ¶ 10, **Exhibit D**.  Here, Defendant's inexplicable decision to use the exact same color as Plaintiff's inherently distinctive product only compounds Defendant's bad faith.  And thus, this factor too, tips in Plaintiff's favor.

C.  Doubts Regarding the Likelihood of Confusion Favor Plaintiff

In short, despite Defendant's counsel's warning that Defendant "stay away from anything that Miss Jennie's [sic] is using'" Defendant, instead, moved as close as possible to Plaintiff's MISS JESSIE'S Mark with the deliberate intent to copy the entire look, feel, and overall "old fashioned" commercial impression of Plaintiff's MISS JESSIE'S Mark and even rejected its other proposed mark, "Miss Leslie's," which its counsel concluded to be "clearer" than "Miss Jackie's/Jacqui's." Given that Defendant considers Plaintiff to be a direct competitor, and consumers are encountering the competing hair care products in the same channels of trade (and often on the same shelves in the same store), it can come as no surprise that all the *Polaroid* factors tip in Plaintiff's favor. In any event, even if there were a close call (and there is not), all "doubts … must be resolved in favor of the senior user." *Henegan*, 2002 WL 1300252, at *6. Particularly, where, as here, Defendant was warned about the risks of litigation.

D.  Plaintiff Has Demonstrated its Federal Claim for False Designation of Origin

"[T]o prevail on a claim for false designation of origin under the Lanham Act, a plaintiff must demonstrate consumers are likely to be confused as to the source of the service because of the entrance in the marketplace of defendant's mark." *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 440 (E.D.N.Y. 2009); *see also Register.Com, Inc.*, 2002 WL 31894625 ("to succeed on a false designation of origin claim, a plaintiff generally must show that it has a valid and protectable mark and that the defendant's conduct is likely to cause confusion concerning the source or sponsorship of the goods or services in question").

As set forth in detail above, Plaintiff has established that it has a valid and protectable mark and that Defendant's conduct is not only likely to cause confusion concerning the source and/or sponsorship of Defendant's products, but has, in fact, already caused actual confusion and initial consumer confusion. Accordingly, the same reasons that support Plaintiff's federal claim for unfair

competition under the Lanham Act also support Plaintiff's claim for false designation of origin.  *See Kuklachev*, 600 F. Supp. 2d, at 440; *see also Register.com*, 2002 WL 3189465, at * 8.

      E.  <u>Plaintiff Has Established its State Law Claim for Unfair Competition</u>

Having established the merits of its Lanham Act claims, Plaintiff has likewise established its right to relief under New York State common law, because, as a matter of law, "<u>whether we call the violation infringement, unfair competition or false designation of origin, the test is identical</u>.  *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1345-46 (E.D.N.Y. 1994) (*citing* 15 U.S.C. § 1125 and N.Y. Gen. Bus. Law § 368-d) (emphasis added) (citations and quotation marks omitted)); *see also Calvin*, 444 F.Supp.2d at 256, 257 ("plaintiffs' claims of trademark infringement under federal and state law, false designation of origin under federal law, and unfair competition under [N.Y. G.B.L. § 349], the touchstone of [all] these claims is a likelihood of consumer confusion as to product authenticity or origin") (**<u>Rakoff, J.</u>**) (granting preliminary injunction sought in connection with alleged Lanham Act-related claims (and their state law equivalents), and where, having already determined that a likelihood of confusion existed as between the parties' competing marks at issue in *Calvin*, in resolving numerous claims identical to those asserted by Plaintiff here in favor of the plaintiff in *Calvin*, this Court concluded, "that defendants are therefore liable for federal and state trademark infringement, false designation of origin, and unfair competition under state law").

As the Honorable Judge Learned Hand observed, "[t]he whole basis of the law of 'unfair competition' is that no one shall sell his goods in such a way as to make it appear that they come from some other source.  The simplest form of this is to use the name or trademark of another." *Am.-Marietta Co. v. Krigsman*, 275 F.2d 287, 289 (2d Cir. 1960); *see also Mortellito v. Nina of California, Inc.*, 335 F. Supp. 1288, 1295 (S.D.N.Y. 1972) ("<u>unfair competition no longer requires that plaintiff's [mark] shall have acquired a 'secondary meaning'.  The controlling question in all</u>

<u>cases … is whether the acts are fair or unfair</u>”) (emphasis added).

As discussed in detail above, there can be no debate that Defendant's use of its AUNT JACKIE'S Mark in connection with Defendant's products has been and continues to be decidedly unfair.  Proof positive of the demonstrable negative effects that Plaintiff has suffered as a result of Defendant's infringing use can be seen in instances of actual confusion and initial consumer confusion.  Accordingly, having demonstrated the merits of its federal claims for unfair competition and false designation of origin under the Lanham Act, Plaintiff has necessarily established the merits of its unfair competition claim under New York State common law.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests a final decision:  (1) confirming Plaintiff's rights to relief in connection with its claims for: (a) federal trademark infringement pursuant to Section 32(1)(A) of the Lanham Act (15 U.S.C. § 1114); (b) federal unfair competition and false designation pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (c) common law unfair competition under New York State common law; (2) ordering Defendant to cease all use of its AUNT JACKIE'S Mark; (3) awarding Plaintiff all out-of-pocket expenses together with all appropriate damages; and (4) granting such other, further and different relief as the Court may deem just and proper.

Dated: New York, New York
          February 26, 2013

Respectfully submitted,

CARTER PEK, P.C.

By:  /s/ D. Reeves Carter
          **D. Reeves Carter**
          **Matthew A. Pek**
110 Wall Street, 11th Floor
New York, New York 10005

*Attorneys for Plaintiff, Akiro, LLC*